IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ROSEMARY SHIELDS,  :   <br>  :   <br> Plaintiff,  :   <br>  v.  :  CIVIL ACTION <br>  :   <br> MAIN LINE HOSPITALS, INC.,  :  NO. 2:22-cv-03307-MRP <br> and MAIN LINE HEALTH, INC.,  :   <br>  :   <br> Defendants.  :   |  |

**MEMORANDUM**

**PEREZ, J.**                                                                        **October 27, 2023**

      Plaintiff Rosemary Shields commenced this action against her employer, Defendants Main Line Hospitals, Inc. and Main Line Health, Inc. (collectively, "Main Line Health"), alleging religious discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"). Specifically, Ms. Shields brought claims for failure to accommodate, disparate treatment, and retaliation after Main Line Health terminated her and declined to rehire her after she refused to comply with a mandatory COVID vaccination policy for employees.

      The parties now both move for summary judgment. Ms. Shields moves for summary judgment on the undue hardship issue implicated by her failure to accommodate claim. Main Line Health moves for summary judgment on all counts. For the reasons that follow, Main Line Health's motion for summary judgment is granted in part and denied in part. Ms. Shields's motion for summary judgment is denied.

I.  **BACKGROUND**

Rosemary Shields was terminated by Main Line Health because she refused to get vaccinated against COVID. ECF No. 39-1 at ¶¶ 108-09. Ms. Shields opposed the vaccine based on her belief in God-given natural immunity and belief against the use of fetal cell lines in the development of vaccines. In September 2021, due to the strain COVID placed on the healthcare system, Main Line Health implemented a mandatory COVID vaccination policy for employees, unless they were granted a religious exemption. ECF No. 30-2 at ¶ 58. On October 8, Ms. Shields sent an email to Main Line Health's Chief Executive Office ("CEO") and forty others, attaching a letter where she communicated concerns about staffing shortages, safety concerns, and questioned Main Line Health's failure to take natural immunity into account in enforcing the vaccination policy. *Id.* at ¶¶ 117-18. On October 14, Plaintiff met with Main Line Health's CEO, Chief Medical Officer ("CMO"), Chief Operational Officer ("CEO"), and VP of Patient Care Services to discuss the concerns she addressed in her letter. *Id.* at ¶ 124.

On October 20, the religious exemption committee considered Ms. Shields's religious exemption request. *Id.* at ¶ 151. The committee that considered the request received only a letter from Ms. Shields's attorney in support of her request. *Id.* at ¶ 154. The same day, the committee denied the request, explaining that the attorney letter did not explain how her belief was in conflict with the vaccination requirement. *Id.* at ¶ 158. Ms. Shields appealed the denial and submitted four documents in support of her appeal: (1) a religious exemption form; (2) the letter from her attorney; (3) a one-and-a-half-page letter; and (4) a seven-page research letter. *Id.* at ¶ 159. The appeal committee consisted of the CMO, COO, and others. *Id.* at ¶ 96. On October 27, 2021, the appeal committee notified Ms. Shields that it denied her appeal. *Id.* at ¶ 197. Main Line Health's mandatory COVID vaccination policy required all employees to be vaccinated against COVID by

November 1, 2021, unless they were granted an exemption. ECF No. 39-1 at ¶ 25. Ms. Shields never received the COVID vaccine and was terminated on November 2. *Id.* at ¶ 110.

In May 2022, Ms. Shields reapplied for her job. *Id.* at ¶ 111. Because the COVID vaccination policy remained in place, she submitted a new religious exemption request. *Id.* In support of her exemption request, Ms. Shields submitted (1) a new exemption request form; (2) a letter from Reverend Michael J. Gerlach; and (3) the one-and-a-half-page letter she submitted in her appeal, among other materials already submitted. *Id.* at ¶ 112. The committee denied Ms. Shields's second religious exemption request. *Id.* at ¶ 122. As a result, she was not rehired as vaccination was pre-requisite to employment, absent an exemption. *Id.* at ¶ 129.

## I. LEGAL STANDARD

Summary judgment is properly granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc., et al.*, 954 F.3d 615, 618 (3d Cir. 2020). A dispute as to those facts "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* This Court "view[s] all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.*

## II. DISCUSSION

Main Line Health moves for summary judgment on all counts. Ms. Shields, on the other hand, moves for summary judgment on Main Line Health's "undue burden" defense, which it asserts in its Fifth, Sixth, and Seventh affirmative defenses. For the reasons set forth below, Main Line Health's motion will be granted in part and denied in part. Ms. Shields's motion will be denied.

Under Title VII, employees may assert two forms of religious discrimination: failure to accommodate and disparate treatment. *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 281 (3d Cir. 2001). Ms. Shields asserts both, in addition to a retaliation claim. We address each theory of liability in turn.

### A.  Failure to Accommodate

To make a *prima facie* case of failure to accommodate, "the employee must show: (1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement." *EEOC v. GEO Group, Inc.*, 616 F.3d 265, 271 (3d Cir. 2010). "The burden then shifts to the employer to show (1) it made a good-faith effort to reasonably accommodate the religious belief, or (2) such an accommodation would work an undue hardship upon the employer and its business." *Id*.  We begin with Ms. Shields's *prima facie* case.

Main Line Health challenges only the first element of Ms. Shields's *prima facie* case.  Thus, to determine whether Ms. Shields has met her burden, this Court need only consider whether there is sufficient evidence upon which a factfinder could conclude that Ms. Shields's beliefs are (1) sincerely held, and (2) religious within her own scheme of things. *See Welsh v. U.S.*, 398 U.S. 333, 339 (1970). Main Line Health then argues, even if Ms. Shields has established a *prima facie* case, it is still entitled to summary judgment because granting Ms. Shields a religious exemption would have "imposed an undue burden" on it. *See* ECF No. 30-1 at 14.

#### 1.  Sincerely Held Religious Belief

Main Line Health argues that Ms. Shields's objections to the COVID vaccine—namely, her belief in natural immunity and her belief against taking a vaccine derived from fetal cell lines—are not religious in nature and are therefore not subject to accommodation. This Court is mindful that

whether Ms. Shields's beliefs are religious "presents a most delicate question[.]" *Africa v. Com. of Pa.*, 662 F.2d 1025, 1031 (3d Cir. 1981). This Court is equally mindful, however, that "the very concept of ordered liberty precludes allowing [Ms. Shields], or any other person, a blanket privilege to make [her] own standards on matters of conduct in which society as a whole has important interests." *Id.* (internal quotation marks omitted).

Whether a belief is sincerely held is a question of fact. *See U.S. v. Seeger*, 85 S. Ct. 850, 863 (1965). To determine whether a belief is "religious," the Third Circuit has routinely considered whether it: (1) addresses fundamental and ultimate questions having to do with deep and imponderable matters; (2) is comprehensive in nature; and (3) is accompanied by the presence of certain formal and external signs. *Africa v. Com. of Pa.*, 662 F.2d 1025, 1032 (3d Cir. 1981). Fundamental and ultimate questions "could be best described as . . . questions having to do with, among other things, life and death, right and wrong, and good and evil." *Id.* at 1033. A belief is comprehensive in nature if it "consist[s] of something more than a number of isolated, unconnected ideas." *Id.* at 1035. That is, it cannot be "confined to one question or one moral teaching; it has a broader scope. It lays claim to an ultimate and comprehensive 'truth.'" *Id.* Lastly, the presence of certain formal and external signs can include "formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observance of holidays, and other similar manifestations associated with the traditional religions." *Id.*

### a.      Natural Immunity

Ms. Shields has not established that her belief in natural immunity is religious under the *Africa* framework. Ms. Shields first mentioned her belief that she has natural immunity in the letter she sent to Main Line Health's CEO on October 8, 2021. ECF No. 30-2 at ¶ 118. The letter states that "[n]atural immunity[] is something humans have acquired and perfected for millions of years.

. . . How much more proof do you need that natural immunity works? . . . How can a premier medical and health care organization ignore the proven medical science of natural immunity?" ECF No. 30-17 at 5-6. The letter adds, "I am the one who has not had Covid again despite being exposed to it numerous times. How can you justify firing me and continue to let vaccinated nurses work even though they can get Covid even after getting the vaccine?" *Id.* at 5. Ms. Shields states that she mentioned her natural immunity beliefs again during the meeting on October 14, 2021, but none of the meeting attendees were part of the committee that denied her religious exemption request on October 20, 2021, nor is there evidence that those who attended the meeting influenced the committee's decision. *See* ECF No. 30-2 at ¶¶ 127, 153. When denying Ms. Shields's exemption request on October 20, Main Line Health had only the letter Ms. Shields's attorney sent to consider. *Id.* at ¶ 154. The letter briefly mentions various laws that protect religious freedom and prohibit discrimination, but it never provides Ms. Shields's purported religious beliefs, nor does it explain how those beliefs conflict with her getting vaccinated against COVID. *See* ECF No. 30-19.

Ms. Shields has not satisfied the first *Africa* factor. In *Fallon v. Mercy Catholic Med. Ctr. of Se. Pennsylvania*, the Third Circuit concluded that a plaintiff's opposition to the flu vaccine did not satisfy the first *Africa* factor where "he simply worrie[d] about the health effects of the flu vaccine, disbelieve[d] the scientifically accepted view that it is harmless to most people, and wishe[d] to avoid th[e] vaccine." 877 F.3d 487, 492 (3d Cir. 2017). Determining that "the basis of his refusal of the flu vaccine . . . is a medical belief, not a religious one[,]" the Third Circuit held that the beliefs did not "address fundamental and ultimate questions having to do with deep and imponderable matters." *Id.* Ms. Shields's natural immunity belief does not satisfy the first *Africa* factor for the same reasons. At the time in which her first exemption request was denied,

Ms. Shields had demonstrated that her natural immunity belief is rooted in medical and scientific beliefs, rather than religion. Ms. Shields shared her medical and scientific views that conflict with COVID vaccination requirement, but she never provided a religious basis for her opposition. It therefore follows that no reasonable jury could find that Ms. Shields's natural immunity belief was religious when the committee denied her exemption request on October 20, 2021.

Ms. Shields's appeal of the denial was supported by additional documentation. She submitted a seven-page research letter that cited scientific and philosophical theories in support of natural immunity but attempted to connect this belief to religion only once. *See* ECF No. 30-26 at 3 ("My natural immunity which my creator God bestowed on me when he created me works as I had discussed in my first exemption letter."). Indeed, Plaintiff identified her natural immunity belief separate and apart from her religious beliefs. *See id.* at 1 (stating that she is requesting the exemption "based on (1) my religious beliefs and (2) my natural immunity."). Ms. Shields also submitted a one-and-a-half-page letter that delved more into her natural immunity beliefs. It stated, for example, that "God created us and through his great plan of creation, covers us in vernix which affords us great protection against bacteria and microorganisms." ECF No. 30-25 at 1. Lastly, Plaintiff submitted an exemption form that stated her "creator has endowed [her] with natural immunity," but otherwise makes the scientific and medical case for why she thinks her belief in natural immunity should preclude her from needing the vaccine. *See* ECF No. 30-24 at 4. For example, she argues that "[i]t has been shown through studies that COVID vaccine can decrease the effects of normal immunity." *Id.*

This Court has explained that plaintiffs cannot convert medical beliefs into religious ones by simply mentioning God. *See, e.g., Ulrich v. Lancaster Gen. Health*, No. 22-4945, 2023 WL 2939585, at *5 (E.D. Pa. Apr. 13, 2023) (dismissing a failure to accommodate claim where the

plaintiff "clearly state[s] medical concerns which she attempts to 'cloak with religious significance'"); *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. 19-5734, 2022 WL 507479, at *4-5 (E.D. Pa. Feb. 18, 2022) (granting summary judgment on a failure to accommodate claim where the plaintiff submitted a religious exemption request weeks after unsuccessfully making only medical-based arguments in opposition to taking the flu vaccine). In her appeal, Ms. Shields did not demonstrate that her natural immunity beliefs were religious in nature. Instead, she listed "a number of isolated, unconnected ideas" that do not rise to the level of comprehensiveness necessary to be considered religion under the *Africa* framework. *See Africa*, 662 F.2d at 1035 (explaining that a belief is comprehensive in nature when it "consist[s] of something more than a number of isolated, unconnected ideas.'"). Ms. Shields's argument that God bestowed natural immunity upon her, thereby obviating the need to get vaccinated, "would amount to a blanket privilege and a limitless excuse for avoiding all unwanted obligations." *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 466 (M.D. Pa. 2022). "Though fungible enough to cover anything [Ms. Shields] trains it on, this belief is an isolated moral teaching . . . not a comprehensive system of beliefs about fundamental or ultimate matters." *Id.* at 465. For these reasons, Ms. Shields has not satisfied the second *Africa* factor.

In support of her May 2022 religious exemption request, Ms. Shields submitted a new exemption request form, a letter from Reverend Michael J. Gerlach, and other materials she previously submitted to the committee. Ms. Shields's new exemption request form stated that the vaccine "goes against [her] sincerely held religious beliefs and informed religious conscience" but makes no mention of natural immunity. ECF No. 30-27 at 4. Merely invoking the words "sincerely held religious beliefs" does not "cloak Ms. Shields's concerns with religious significance." *See Ulrich,* 2023 WL 2939585, at *5. The letter Ms. Shields submitted from Reverend Gerlach also

baldly stated that she is requesting an exemption based on her "informed religious conscience." *Id.* at 7. Reverend Gerlach makes no mention of the Catholic faith in the letter, nor does he endorse Ms. Shields's beliefs. *Id.* Even further, Ms. Shields testified during her deposition that she is a member of Saint Bernadette's Church and her pastor is Father John Masson, but likened meeting with Reverend Gerlach to getting a second opinion from another doctor. ECF No. 30-4. This Court has found similar evidence to be insufficient in proving that a plaintiff sincerely holds a religious belief. *See Aukamp-Corcoran*, 2022 WL 507479, at *5 (noting that a plaintiff attended a pastor's church only sporadically and "had never discussed her spiritual beliefs with [the pastor] before she asked him to write the letter [in support of her religious exemption] for her."). Thus, while "formal and external signs certainly exist with respect to the [Catholic faith,] [i]t is less clear that [Ms. Shields's] beliefs . . . are accompanied by such signs." *Blackwell v. Lehigh Valley Health Network*, No. 22-3360, 2023 WL 362392, at *8 (E.D. Pa. Jan. 23, 2023). Ms. Shields's has not satisfied the third *Africa* factor.

At bottom, Ms. Shields has demonstrated that her natural immunity belief is more of a medical belief, than a religious one. Based on the record before the Court, no reasonable jury could find that Ms. Shields's natural immunity belief constitutes a sincerely held religious belief. Therefore, Ms. Shields cannot establish a *prima facie* case of religious discrimination on this basis.

### b. Fetal Cell Line Usage

In contrast to her natural immunity beliefs, Ms. Shields has sufficiently demonstrated that her belief against taking a vaccine derived from aborted fetal cell lines is religious under the *Africa* framework. This Court notes, however, that Ms. Shields did not mention her belief against the use of fetal cell lines until after her initial religious exemption request was denied. Therefore, her

failure to accommodate claim fails to the extent it applies to Main Line Health's first denial of her first application for a religious exemption.

With respect to Main Line Health's denial of Ms. Shields's appeal and second exemption request, genuine disputes as to material facts exist. Of the four documents Ms. Shields submitted in her appeal, two referenced her belief regarding fetal cell lines. Her seven-page research letter states, "[m]y faith rejects the use of Aborted Fetal Tissue in Vaccines and Medical Research." ECF No. 30-26 at 1. It continues, "[t]he Catholic Church's position on abortion is very clear, from the moment of conception, life of every human being is to be respected in an absolute way,…(therefore) [sic], no one can under any circumstance claim the right directly to destroy an innocent human being." *Id*. In addition, Ms. Shields's one-and-a-half-page letter states that each baby is "created in the likeness of God." She adds:

> If that likeness does not fit into a vision or the version of what many perceive that God looks like, we so easily terminate that being.
>
> As a labor and delivery nurse, I have suffered witness to this. I will not participate in such an action as I believe all are created in God's likeness.

*Id*. Ms. Shields also submitted this one-and-a-half-page letter with her second exemption request in May 2022. ECF No. 39-1 at ¶ 112

Ms. Shields has satisfied the *Africa* factors here. Her belief against the use of fetal cell lines touches upon "life and death" and "right and wrong," thereby addressing fundamental questions concerning deep and imponderable matters. *See Africa,* 662 F.2d at 1033. Ms. Shields identifies as Catholic, describes her adherence to her Catholic faith, and cites Bible scriptures that she interprets as forbidding abortion. She has therefore connected her belief against the use of fetal cell lines to a comprehensive religion. *Cf. Winans v. Cox Automotive, Inc.*, No. 22-3826, 2023 WL 2975872, at *4 (E.D. Pa. Apr. 17, 2023) (holding that a plaintiff did not connect his belief against the use of fetal cell lines to a comprehensive religion where he "[did] not even identify *why* [he]

object[ed] to the use of fetal cell lines in the development of the COVID-19 vaccine." (emphasis in original)). Based on the foregoing, Ms. Shields has also demonstrated that her fetal cell line usage belief is accompanied by certain formal and external signs.

Main Line Health argues that Ms. Shields "ignores the position of Pope Francis and the Catholic bishops that getting vaccinated against COVID-19 was a 'moral obligation.'" ECF No. 30-1 at 15. Ms. Shields's beliefs, however, need not coincide with that of the Catholic Church to be deemed religious. Indeed, an employee's "religious beliefs are protected whether or not his pastor agrees with him." *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 142 (4th Cir. 2017). Main Line Health also notes that Ms. Shields currently takes medications that were tested on fetal tissues. ECF No. 30-2 at ¶¶ 182-83. That argument, however, goes to the sincerity of Ms. Shields's beliefs, which is a question of fact best reserved for a factfinder when determining credibility. *See U.S. v. Seeger*, 85 S.Ct. 850, 863 (1965).

For the foregoing reasons, Ms. Shields has satisfied the *Africa* factors with respect to her fetal cell line usage belief. Accordingly, this Court finds that a reasonable jury could conclude that her belief concerning fetal cell usage is a sincerely held religious belief. Ms. Shields has established a *prima facie* case of religious discrimination of this basis.

### 2. Undue Hardship

The burden now shifts to Main Line Health to demonstrate that accommodating Ms. Shields's sincerely held religious belief would work an undue hardship upon it. Both parties move for summary judgment on the undue hardship issue. Because the evidence is such that a reasonable jury could go either way, summary judgment is not appropriate.

An employer demonstrates an undue hardship "when a burden is substantial in the overall context of [the] employer's business." *Groff v. DeJoy*, 143 S. Ct. 2279, 2294 (2023). An undue

hardship can take both economic and non-economic forms. *EEOC v. Geo Group, Inc.*, 616 F.3d 265, 273 (3d Cir. 2010).

Main Line Health argues that granting Ms. Shields a religious exemption would give rise to substantial cost to the operations of the business, increase health risks to employees and patients, and impose an undue hardship on business operations. ECF No. 28-1 at 1. For example, Dr. Salmon's expert report describes the "tremendous impact" COVID had on health care systems, patient access to care, and quality of care. ECF No. 38 at 13. He explained that alternative infection control strategies "had limitations and the most effective policy to control COVID-19 in health care settings was a compressive approach where strategies were combined or layered." *Id*. Dr. Salmon also stated "[t]he greater the number of religious exemptions[,] the higher the risk of COVID-19 infections and transmissions." *Id.*  Dr. Stallkamp, Main Line Health's Chief Medical Officer, testified that employees who were granted exemptions had a higher "risk of exposure . . . and so they would be required to do more testing and necessarily furlough or reassignments." *Id.* at 14. Dr. Stallkamp described this testing requirement as a "significant burden." *Id.*  In addition, Main Line Health's CEO testified that the hospital system "experienced staffing shortages due to rising numbers of COVID cases, . . . health care workers leaving the profession . . . and employees who were furloughed due to COVID exposure." ECF No. 30-2 at ¶ 11.

On the other hand, Ms. Shields argues that Main Line Health's mandatory employee vaccination policy identified reasonable accommodations—weekly testing and reassignment, and additional infection prevention control measures, among other things—but there is no evidence suggesting that these reasonable accommodations created an undue hardship on the business. *See* ECF No. 28-1 at 8. Ms. Shields adds that including her name in the list of employees who received a religious exemption would not have worked an undue hardship. *Id.* Ms. Shields points to the

CEO's deposition testimony, where he stated that "routine testing . . . reduced the likelihood that [those granted exemptions] would be unknowingly exposing others." ECF No. 28-14 at 28:10-29:4. He continued, "So I think that – I don't believe we placed our patients or our other colleagues at risk." *Id.* This testimony by itself creates a genuine dispute of material fact. Whether granting religious exemptions placed Main Line Health's patients and employees at risk is central to determining whether granting Ms. Shields a religious accommodation would have imposed an undue hardship on Main Line Health.

Because genuine issues of material fact exist, it is inappropriate to grant summary judgment to either party on the undue hardship issue. As such, Ms. Shields's failure to accommodate claim may proceed to the extent the claim is premised on (i) her fetal cell line usage beliefs, and (ii) Main Line Health's failure to accommodate her after considering her appeal and second exemption request.

### B.   Disparate Treatment

A plaintiff seeking to establish a prima facie case of discrimination under a disparate treatment theory of religious discrimination must show that (1) she is a member of a protected class; (2) she was qualified for the position she sought; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). There is no dispute that Plaintiff is Catholic, was qualified as a labor and delivery nurse, and her termination and failure to rehire were adverse employment actions. The parties dispute therefore centers on whether the termination and failure to rehire occurred under circumstances that could give rise to an inference of intentional discrimination.

As Main Line Health has noted, "there is no record evidence to support her claim that non-Catholics were treated more favorably than she was." ECF No. 30-1 at 26. Indeed, Plaintiff's briefing declines to make any argument that she was treated differently because she was Catholic. Accordingly, summary judgment is granted on the disparate treatment issue.

C.     **Retaliation**

To establish a prima facie case of retaliation, Ms. Shields must show: (1) that she engaged in a protected activity; (2) there was an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the protected activity and the adverse action. *See Daniels v. Sch. Dist. of Phila.,* 776 F.3d 181, 193 (3d Cir. 2015)*.* An employee's request to accommodate her religious beliefs constitutes a protected activity under Title VII. *Bonilla v. City of Philadelphia*, No. 19-3725, 2021 WL 214301, at *3 (E.D. Pa. Jan. 21, 2021). As discussed above, Main Line Health terminated Ms. Shields and decided to not rehire her after she requested a religious exemption. Therefore, the only question left to consider is whether there is a causal connection between the protected activity and the adverse action.

Ms. Shields argues that her October 14, 2021 meeting with leadership caused Main Line Health to deny her exemption request, terminate her, and decide not to rehire her. She points to comments the CEO made during the October 14 meeting, such as "you're not getting a religious exemption." ECF No. 36 at 19. Ms. Shields also cited an email she received from the CEO after her initial request was denied but before her appeal was decided. The email states that the CEO "reflected a great deal on the conversation in the meeting" and "based on what [she]verbally shared as [her] reason for requesting an exemption, [they] did not believe it would be granted." *Id.* at 20. The record shows that the Chief Medical Officer and Chief Operational Officer attended the

October 14 meeting, reviewed Ms. Shields's appeal, and the October 14 meeting was referenced during the appeal committee's review. *Id.* at 20. Thus, viewing the evidence in the light most favorable to Ms. Shields, a reasonable jury could conclude that her religious exemption request was denied in retaliation for her remarks at the October 14 meeting.

Therefore, summary judgment is denied as to the retaliation claim.

### III. CONCLUSION

For the foregoing reasons, Main Line Health's Motion for Summary Judgment is granted in part and denied in part. The Motion is granted as to the religious discrimination claims to the extent the claims (i) are premised on Ms. Shields's natural immunity beliefs, and (ii) allege disparate treatment. The Motion is denied as to the retaliation claim. It is also denied as to the failure to accommodate claim to the extent the claim is premised on (i) Ms. Shields's fetal cell line usage beliefs, and (ii) Main Line Health's failure to accommodate her fetal cell line beliefs after considering her appeal and second exemption request.

Ms. Shields's Motion for Summary Judgment is denied. An appropriate Order accompanies this Opinion.